# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

MARQUETTE UNIVERSITY,

                Plaintiff,

      v.                              Case No. 20-CV-954

KUALI, INC.,

                Defendant.

## DECISION AND ORDER

1. **Facts and Procedural Background**

On February 6, 2019, Marquette University applied to renew its longstanding federal grant for its Geriatric Workforce Enhancement Program. Although the granting agency scored the application very highly, it was rejected because it did not "clearly provide consistent budget totals between the budget and the budget narrative," and the budget exceeded the $3,750,000 grant maximum. (ECF No. 49, at 12, 15, ¶¶ 42, 43, 50 (all citations to the record reflect the ECF pagination).)

The application exceeded the grant maximum because a bug in the software that Marquette used to submit the application led to certain entries being counted twice. (ECF Nos. 44 at 12, ¶ 42; 13, ¶ 43; 49 at 14, ¶ 47.) Marquette did not detect the error in

the PDF version of the application that it reviewed (ECF No. 44 at 14-15, ¶¶ 46-48), and because Marquette submitted the application only hours before the deadline (even though its and the granting agency's guidelines called for applications to be submitted at least three days before the deadline) (ECF No. 44 at 11, ¶¶ 37-40), the error was not corrected before the deadline.

Marquette has sued the provider of the software it used, Kuali, Inc., alleging breach of contract, breach of warranty, and negligence. (ECF No. 44 at 18, ¶ 59.) It seeks nearly $4.5 million in damages, which includes the amount of the lost grant as well as additional sums Marquette contends it would have obtained had it received the grant. (ECF No. 55 at 71, ¶ 81.)

Marquette's contract with Kuali, however, limited Marquette's remedies for any breach of warranty to termination of the contract and a refund of any prepaid fees. (ECF No. 49 at 10, ¶¶ 31-33.) The contract further disclaimed other damages, stating, "in no event will either party have any liability to the other party for any lost profits, revenues or indirect, special, incidental, consequential, or punitive damages, whether an action is in contract or tort and regardless of the theory of liability, even if a party has been advised of the possibility of such damages." (ECF No. 55 at 65, ¶ 67.)

In an effort to avoid these limitations, Marquette argues that the contract is subject to the Uniform Commercial Code because it is a contract predominantly for the sale of goods. (ECF No. 30 at 12-18.) It then argues that it is entitled to all remedies

available under the UCC because the exclusive remedy set forth in the contract "fails of its essential purpose." (ECF No. 30 at 23-28.)

Both sides have moved for summary judgment.[1] Kuali, for its part, argues that the UCC does not apply because its contract with Marquette was not for the sale of goods but rather was a contract for the provision of services. But even if Marquette could get around the contract's limitations and disclaimers, show that the UCC applied, and prove that Kuali breached its warranty, Kuali argues that Marquette's claim would still fail because it cannot prove it suffered any damages. Having reviewed the written record, the court finds oral argument to be unnecessary and therefore denies Kuali's request for oral argument (ECF No. 37 at 8).

All parties have consented to this court in accordance with 28 U.S.C. § 636(c). (ECF Nos. 6, 8.) The court has jurisdiction pursuant to 28 U.S.C. § 1332. The parties agree that Wisconsin law applies. (ECF Nos. 30 at 13, fn. 2; 37 at 11.)

## 2. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it "might affect the outcome of the suit" and a dispute is "genuine" only if a reasonable factfinder could

---

[1] As part of its summary judgment submissions Marquette filed a "Reply to Kuali, Inc.'s Responses to Marquette University's Statement of Proposed Undisputed Material Facts …." (ECF No. 55.) The court's local rules do not permit such a reply. *Arms v. Milwaukee Cty.*, No. 18-CV-1835, 2021 U.S. Dist. LEXIS 64654, at *7 (E.D. Wis. Apr. 1, 2021). Therefore, the reply (ECF No. 55 at 1-41) is disregarded.

return a verdict for the non-movant. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). In resolving a motion for summary judgment, the court is to "construe all evidence and draw all reasonable inferences from the evidence in" favor of the non-movant. *E.Y. v. United States*, 758 F.3d 861, 863 (7th Cir. 2014) (citing *Gil v. Reed*, 535 F.3d 551, 556 (7th Cir. 2008); *Del Raso v. United States*, 244 F.3d 567, 570 (7th Cir. 2001)). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and [in] opposition to the motion for summary judgment." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016).

**3. Analysis**

**3.1. Damages**

Kuali argues that Marquette's alleged damages are wholly speculative because it was not guaranteed to receive the grant it applied for. For that reason, this case should be dismissed. (ECF No. 37 at 9.)

Damages calculations commonly involve a degree of speculation. While wholly speculative damages are not recoverable, *Sopha v. Owens-Corning Fiberglas Corp.*, 230 Wis. 2d 212, 227, 601 N.W.2d 627, 634 (1999), absolute certainty of damages is not required, *Plywood Oshkosh, Inc. v. Van's Realty & Constr., Inc.*, 80 Wis. 2d 26, 31, 257 N.W.2d 847, 849 (1977). Damages need be established only with "reasonable certainty." *Id.; see also AccuWeb, Inc. v. Foley & Lardner*, 2008 WI 24, fn. 8, 308 Wis. 2d 258, 278, 746

N.W.2d 447, 457; *Magestro v. N. Star Envtl. Const*, 2002 WI App 182, 256 Wis. 2d 744, 753, 649 N.W.2d 722, 726; Restat 2d of Contracts, § 352.

Given the high score Marquette's application received from the granting agency, Marquette's longstanding history of receiving similar grants for the same program, and other facts, Marquette has presented evidence from which a reasonable finder of fact could conclude that, but for the error in the software, it would have obtained the grant.

But as Kuali notes in response to Marquette's motion for summary judgment, the amount of the grant does not necessarily represent the amount of Marquette's damages. The grant was a "cost reimbursement grant[]" (ECF No. 49 at 2, ¶ 4) designed to cover the costs of the Geriatric Workforce Enhancement Program. Marquette cancelled that program after the grant was denied, and thus did not incur the costs of the program that the grant was intended to offset.

There are two problems with Kuali's argument. First, Kuali first presented it only in response to Marquette's motion. Therefore, in Marquette's view, it would, at best, provide a basis for denying Marquette's summary judgment motion but would not be a basis for granting Kuali's. Second, it overlooks evidence that certain expenses that would have been covered by the grant were instead paid by Marquette from other resources. For example, salaries of staff who would have been paid under the grant were paid from other university resources.

Ultimately, ensuring a jury considers only appropriate damages is a matter of carefully crafting jury instructions. *See Magestro*, 2002 WI App 182, ¶¶ 17-18. For present purposes it is sufficient to say that Marquette has presented evidence that could lead a reasonable finder of fact to conclude that it suffered some damages as a result of the alleged bug in Kuali's software. Therefore, the court rejects Kuali's argument that Marquette cannot prove it suffered damages as a result of Kuali's conduct.

### 3.2. Kuali Research Cloud as a "Good" Under the UCC

The UCC applies only to the sale of "goods." "'Goods' means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (ch. 408) and things in action." Wis. Stat. § 402.105(1)(c).

"[T]he applicability of the Uniform Commercial Code to software is a question that has confounded courts in the digital age." *SAS Inst., Inc. v. World Programming Ltd.*, No. 5:10-25-FL, 2016 U.S. Dist. LEXIS 79230, at *31 (E.D.N.C. June 17, 2016). "Most courts to have considered the issue have held that computer software qualifies as a 'good' under Article 2 of the UCC." *Dig. Ally, Inc. v. Z3 Tech., LLC*, No. 09-2292-KGS, 2010 U.S. Dist. LEXIS 103715, at *27 (D. Kan. Sep. 30, 2010) (citing cases); *see also Rottner v. AVG Techs. United States, Inc.*, 943 F. Supp. 2d 222, 230 (D. Mass. 2013) ("courts nationally have consistently classified the sale of a software package as the sale of a good for UCC purposes") (citing cases); *see also ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447,

1452 (7th Cir. 1996) (applying Wisconsin law); *Newcourt Fin. USA, Inc. v. Ft Mortg. Cos.*, 161 F. Supp. 2d 894, 897 (N.D. Ill. 2001) (applying Illinois law). *But see Micro-Managers v. Gregory*, 147 Wis. 2d 500, 509, 434 N.W.2d 97, 100 (Ct. App. 1988) (holding that a contract for custom software was predominantly a contract for services because nearly all the cost of the software was attributable to labor and the language of the contract connoted as service). This authority, however, relates to traditional software maintained on hardware controlled by the user.

Kuali refers to itself as a "software as a service" (or "SaaS") provider. (ECF No. 44 at 1, ¶ 1.) This term of art generally refers to "cloud computing" services where a provider enables a customer to use software without the customer needing to install and maintain the software on local hardware. *See In re JobDiva, Inc.*, 843 F.3d 936, 938 (Fed. Cir. 2016). The customer commonly pays a subscription fee to access the software on an as-needed basis through a website. Michael L. Rustad, *Computer Contracts* § 1.02[h] (2021); Michael L. Rustad & Elif Kavusturan, *A Commercial Law for Software Contracting*, 76 Wash. & Lee L. Rev. 775, 779 (2019).

Consistent with this model, Kuali maintained its software on its own servers (ECF No. 44, at 2, ¶ 3), and Marquette paid an annual subscription fee to access it through a web browser (ECF No. 44 at 3, ¶ 5; 6, ¶ 20; 10, ¶ 30). Kuali created and maintained three separate instances of the software for Marquette, regularly maintaining, backing up, and updating each. (ECF No. 44 at 7, ¶ 23.)

Although all software is intangible, it is on some level movable in the sense that it can be transferred from one medium to another. In light of the compelling weight of authority accepting that software is a good under the UCC, it is easy to conclude that the software underlying Kuali Research Cloud was a good.

But Marquette did not purchase the software; it purchased only access to the software. In this regard, as to the software, the agreement was closer to a license rather than a traditional sale. Nonetheless, the Court of Appeals for the Seventh Circuit, in a case applying Wisconsin law, applied the UCC to a software licensing agreement. *ProCD*, 86 F.3d at 1452. *But see Attachmate Corp. v. Health Net, Inc.*, No. C09-1161 MJP, 2010 U.S. Dist. LEXIS 114445, at *6 (W.D. Wash. Oct. 26, 2010) ("The weight of authority favors application of common law and not the UCC with regard to software licenses."); *Berthold Types Ltd. v. Adobe Sys.*, 101 F. Supp. 2d 697, 698 (N.D. Ill. 2000) ("A pure license agreement … does not involve transfer of title, and so is not a sale for Article 2 purposes.") (applying Illinois law); White, Summers, & Hillman, Uniform Commercial Code § 2:2 (6th ed.) (noting that courts have regarded software licenses as sales of goods but stating, "Of course, if properly read, § 2-106(1) does not cover licenses because there is no passage of title.") In any event, Kuali does not argue that Marquette's contract claim fails because there was not a "sale."

Thus, the court accepts that the contract included a "sale." Given the authority establishing that even licensed software is a good, the contract was at least in part for

the sale of a "good." But the contract also undisputedly included services, such as support for the software and, most significantly, maintaining, backing up, and updating the software on Kuali's own servers and providing Marquette access to the software through a web browser. Thus, the contract constituted a mixed contract for goods and services.

Wisconsin applies the "predominant purpose" test to determine whether a mixed contract is subject to the UCC. *Micro-Managers*, 147 Wis. 2d at 507, 434 N.W.2d at 100. The predominant purpose test "relies on both quantitative and subjective factors," including "the language of the contract, the nature of the business of the supplier, the intrinsic worth of the materials, the circumstances of the parties, and the primary objective they hoped to achieve by entering into the contract." *Linden v. Cascade Stone Co.*, 2005 WI 113, ¶21, 283 Wis. 2d 606, 620, 699 N.W.2d 189, 196 (citations omitted) (discussing the predominant purpose test vis-à-vis the economic loss doctrine); *CG Schmidt Inc. v. Permasteelisa N. Am.*, 142 F. Supp. 3d 755, 767 (E.D. Wis. 2015). Ultimately, the court must consider both objective and subjective factors to determine whether, under the totality of the circumstances, the predominant purpose of the contract was for the sale of goods or services. *Linden*, 2005 WI 113, ¶22.

### 3.2.1. Language of the Contract

At issue is only the parties' 2018 contract. There had been prior contracts between the parties under which Kuali had provided additional services, such as transferring

9

data to the software and configuring the software for Marquette's purposes, but those contracts expired and were supplanted by the 2018 contract. (ECF No. 55 at 4-5, ¶¶ 16-19.)

The 2018 contract is comprised of an Order Form (ECF No. 5-1, a Master Subscription Agreement (ECF No. 5-2), and a Professional Services Agreement (ECF No. 5-3). (ECF No. 49 at 6, ¶ 22; 23, ¶ 79.) The Order Form contains a table captioned, "Products & Services." (ECF No. 5-1 at 4.) Although the caption references services as well as products, the table identifies only "Products," one of which is "Kuali Research Cloud." (ECF No. 5-1 at 4.)

By referring to "Kuali Research Cloud" as a "product," the Order Form could be seen as supporting Marquette's position that the contract was primarily if not exclusively for the sale of goods. After all, courts have sometimes used "product" interchangeably with "good." *See, e.g.*, *Linden*, 2005 WI 113, ¶6. But "product" is not defined in any of the contract documents. "Services," however, is defined in the Master Subscription Agreement as "the products and services that are ordered by You under a free trial or an Order Form and made available online by Us, including associated offline components, as described in the Documentation." (ECF No. 5-2 at 3.)

Further contradicting any implication that, by referring to Kuali Research Cloud as a "product," the contract was suggesting it was a good under the UCC is Exhibit A to the Order Form. Exhibit A is titled "Scope of Services" and contains a table that

"indicates which SaaS services are included." (ECF No. 5-1 at 8.) The table again lists what Kuali had previously identified as "Products" in the "Products and Services" portion of the Order Form (ECF No. 5-1 at 4).

The Master Subscription Agreement consistently uses the term "Services" to describe what Kuali was providing to Marquette. This ordinarily would tend to strongly support Kuali's position that the contract was predominantly one for services. But this support is somewhat undermined by the fact that, as noted above, "Services" was defined in a non-colloquial manner to include both products and services. Thus, confusingly, if the contract were exclusively for "products," it would still use the self-defined term "Services" to discuss those products. Ultimately, the reference to Kuali Research Cloud as a "product" on the Order Form appears to reflect a non-technical use of the term that resulted from the lack of a better term to describe the novel hybrid of goods and services encompassed in SaaS.

The Order Form stated that it was governed by the Master Subscription Agreement and the Professional Services Agreement. (ECF No. 5-1 at 7.) The parties dispute whether the Professional Services Agreement was a relevant part of the 2018 contract; Marquette insists that it did not purchase any "Professional Services" under the 2018 Order Form. The Professional Services Agreement defined the term "Professional Services" as "work performed by Us, Our Affiliates, or Our or their respective permitted subcontractors under an SOW or Order Form, including Our

provision of any Deliverables specified in such SOW or Order Form." (ECF No. 5-3 at 3.) Notwithstanding the fact that it concedes that the Professional Services Agreement was part of the 2018 contract (ECF No. 49 at 6, ¶ 22), Marquette asserts, "Kuali did not contract for any separate professional services" under the 2018 contract. (ECF No. 49 at 7, ¶ 25.) Kuali disputes this and contends that it "agreed to provide Marquette training, support, and implementation services, including assistance with configuring the software to Marquette's needs, and Marquette understood that the 2018 Agreement, which was a renewal of the parties' previous agreement, included such services." (ECF No. 49 at 7-8, ¶ 25.)

There is no dispute that the 2018 contract included those services. But there is no evidence that those services were "Professional Services" within the scope of the Professional Services Agreement. According to the Professional Services Agreement, professional services are to be set forth in a statement of work or an order form. (ECF No. 5-3 at 3, § 2.1.) The court has not been provided with any statement of work, and, as noted above, the Order Form specified purchased "Products" but not "Services." (ECF No. 5-1 at 4.) Consequently, because there is no evidence that Marquette purchased "Professional Services" under the Professional Services Agreement as part of the 2018 contract, Marquette correctly asserts that the Professional Services Agreement is not material to the present dispute. (ECF No. 43 at 12.)

Marquette also argues that the fact that payment under the contract was for a fixed sum rather than, for example, on an hourly basis supports the conclusion that it was predominantly for a good. (ECF No. 30 at 16.) While Marquette is correct that a contract that is billed on an hourly basis may tend to be indicative of a service contract, *see, e.g.*, *Micro-Managers*, 147 Wis. 2d at 508, 434 N.W.2d at 100; *Springbrook Software, Inc. v. Douglas Cty.*, No. 13-cv-760-slc, 2015 U.S. Dist. LEXIS 62566, at *38 (W.D. Wis. May 13, 2015), it overlooks that billing under its contract with Kuali *was* billed on the basis of time. Rather than billing by the hour, Kuali billed by the year. The temporal limitation underscores the fact that Kuali did not permanently transfer anything to Marquette under the contract; Marquette merely received access to Kuali's software and support services for a period of time. The fact that the sum was fixed and disconnected from the extent of services provided does somewhat support the view that the contract was predominantly one for goods. But contracts that charge flat fees for services are far from uncommon.

Overall, the language of the contract tends to modestly support the conclusion that it was predominantly for services. The fact that the Master Subscription Agreement refers extensively to "Services" would tend to support the conclusion that the contract was predominantly for services except for the fact that "Services" was defined to include both products and services. Having said that, never does the contract refer to Kuali transferring anything to Marquette. Instead, it speaks in terms of providing access

to software and support for that software for a limited time and with certain limitations, both of which are more in line with services.

### 3.2.2. Nature of Kuali's Business

The Order Form states, "Kuali is a software as a service (SaaS) provider that exclusively serves colleges and universities." (ECF No. 5-1 at 2.) The use of "service" in such a moniker, however, is far from dispositive. It is easy to envision a wide spectrum of relationships between SaaS providers and customers, ranging from those where the software is paramount and the "cloud" services are incidental, to those where any software is merely a means of accessing a service.

The relationship between Kuali and Marquette lies somewhere in the middle of this spectrum. Software—a good—was at the heart of their relationship. If Kuali did not provide software that facilitated Marquette's submission of grant applications (and other associated research activities that are not at issue here), the contract would not exist. In other words, without the software, Marquette would have no need for Kuali's services.

But Kuali's business was not to simply provide software but also the infrastructure, support, and training necessary to enable its customers to use the software. Those services, however, were ancillary to the software. Without the software, there would be no need for the services.

On balance, this factor supports the conclusion that the contract was predominantly for goods.

### 3.2.3. Worth of the Materials

Although often stated in terms of assessing "the intrinsic worth of the materials," *Linden*, 2005 WI 113, ¶21 (citing *Princess Cruises v. GE*, 143 F.3d 828, 833 (4th Cir. 1998)), this factor more broadly requires the court to consider the relative value of both the goods and services provided under the contract. *Cf.* White, Summers, & Hillman, Uniform Commercial Code § 2:3 (6th ed.) ("Where the value of the goods would exceed the value of the services if the services were purchased separately, goods will predominate.").

The only good at issue—the software—was essentially free. (ECF Nos. 44 at 5, ¶ 15, 16.) Marquette could have maintained and operated the free version of the software on its own hardware and with its own personnel (ECF No. 44 at 5, ¶ 16). However, it did not have the infrastructure or personnel to do this. (ECF No. 44 at 6, ¶ 19.)

There is some evidence that the free version lagged behind the SaaS version in terms of updates (*see* ECF No. 45-2 at 7-8, 132:25-133:7 (Kuali's expert testified that Kuali's attorney told him that someone at Kuali had told him (the attorney) that the free version lagged behind the paid version by "a year or so" and they have "some kind of a schedule" for updating the free version but the expert did not know what it was)). But

15

there is no reason to believe that the more than $37,000 a year Marquette paid for Kuali

Research Cloud (ECF No. 49 at 9, ¶ 26) was simply for quicker access to software

updates.[2]

Because the software was essentially free, the only conclusion is that Marquette

was paying primarily for Kuali to host and maintain the software—services Marquette

could not provide due to a lack of personnel and infrastructure. This factor strongly

supports the conclusion that the parties' contract was predominantly for services.

### 3.2.4.  Circumstances of the Parties

Kuali was a provider of software and support services for that software. As noted

above, Marquette could have obtained Kuali's software largely for free. But Marquette's

circumstances did not permit it to utilize the free software; it lacked the personnel and

infrastructure to operate and manage that software.

Kuali provided software, but largely made that software available for free. A

company that provides its software for free will not be in business long without some

other revenue source. For Kuali, that source was selling the services to facilitate the use

of the software.

In other words, what Marquette lacked were the services that Kuali sold.

Consequently, the circumstances of the parties suggest that the services Marquette

---

[2] Kuali asserts that users of the free software could pay "a small fee for optional updates" (ECF No. 61 at 17), but this assertion is not supported by evidence, and there is no indication as to what that "small fee" would be.

received under the contract were not merely incidental to or supplemental to the licensing of the software. Rather, it was because it lacked those abilities that it needed to contract with Kuali. This factor also strongly supports the conclusion that the contract was predominantly for services.

### 3.2.5. Primary Objective of the Contract

In the broadest sense, the primary objective of the contract was to facilitate Marquette's research activities and, specifically, as is relevant here, make it easier for it to electronically submit applications for grants. That was accomplished through the software.

However, the software required significant infrastructure and support, which were beyond Marquette's capabilities. In other words, without Kuali's services, Marquette could not use Kuali's software. But, conversely, without Kuali's software, there would be no need for Kuali's services.

This factor cuts both ways and on balance is neutral in the analysis.

### 3.2.6. The Predominant Purpose of the Contract Under the Totality of the Circumstances

Assessing the predominant purpose of the contract under the totality of the circumstances is not simply a matter of tallying up the number of factors on each side of the balance. Each factor is not necessarily entitled to equal weight. One factor that weighs heavily one way may outweigh several factors on the other side.

Software was at the core of the relationship between Marquette and Kuali. That software, however, was available for free. Although there is some evidence (ambiguous double-hearsay from Kuali's expert) that the free version may lack the most recent updates, there is no evidence as to the value of these updates. There is certainly no evidence that access to these updates accounted for a material portion of the annual fees Marquette paid to Kuali. If Marquette could have obtained the software for free, the logical question is, "What was Marquette paying Kuali more than $37,000 a year for?"

If Marquette were to use the free version of the software, it would have had to host, maintain, and support the software on its own. But it is undisputed that it lacked the infrastructure and personnel to do so. Consequently, it contracted with Kuali to provide those services. The provision of those services is undoubtedly the reason for nearly all the annual fees Marquette paid. In other words, what Marquette needed from Kuali and was willing to pay more than $37,000 per year for was not software but services in the form of providing the hosting and support necessary for Marquette to use the software.

With this compelling evidence on the services side of the scale, the remaining facts are insufficient to tip the scale the other way. The fact that Marquette needed Kuali's services only because of Kuali's software does not compel a finding that the contract was predominantly for a good. A business model based on selling services to support a "free" good is hardly novel. While goods routinely lie at the heart of such

relationships in the sense that there is no need for the services without the good, the predominant purpose of such a contract remains one for services.

Therefore, the court concludes that the contract was primarily one for services.

Because the contract between Kuali is predominantly one for services, the UCC does not apply. Consequently, Marquette's remedy for its breach of warranty claim is limited to the terms set forth in the contract—specifically, termination of the contract and a refund of any prepaid fees covering the remainder of the term (ECF No. 55 at 11, ¶ 31; *see also* ECF No. 5-2 at 8, § 8.2; 10, § 11.4). Marquette's breach of contract claim is merely a restatement of its breach of warranty claim and likewise premised on the application of the UCC. (ECF No. 9, ¶¶ 46-53.)

Marquette insists that the limited remedies available under the 2018 contract "constitute no remedy at all." (ECF No. 43 at 2.) It is unclear if this is argumentative hyperbole or if, by virtue of the expiration of the contract, there really are no prepaid fees to be returned. Kuali's response indicates it is the latter when it asserts that Marquette "continues to use the software to this day …." (ECF No. 47 at 10.) In any event, there is no evidence or even argument that Marquette terminated the 2018 contract and that Kuali has failed to return any prepaid fees. Consequently, there is no basis to conclude that the limited remedy offered under the 2018 contract presents a live controversy. Accordingly, the court will grant Kuali's motion for summary judgment regarding Marquette's contract and warranty claims.

### 4. Marquette's Negligence Claim

Finally, there is the matter of Marquette's negligence claim. As the parties acknowledge, the negligence claim can survive only if the contract is predominantly for services. (ECF Nos. 9, ¶ 64; 37 at 24.) If the contract were predominantly for goods, the economic loss doctrine would bar Marquette's negligence claim. *See Linden*, 2005 WI 113, ¶8.

But because the contract was predominantly for services and the UCC does not apply, the economic loss doctrine does not apply. *See Linden*, 2005 WI 113, ¶6. However, the contract's limitations on liability do apply. Specifically, Section 10.2 of the Master Subscription Agreement states:

> in no event will either party have any liability to the other party for any lost profits, revenues or indirect, special, incidental, consequential, or punitive damages, whether an action is in contract or tort and regardless of the theory of liability, even if a party has been advised of the possibility of such damages.

(ECF No. 44 at 16-17, ¶ 53 (all caps in original omitted).)

Kuali argues that this provision bars the relief that Marquette seeks. (ECF No. 37 at 20-23.) Marquette's only response to this argument is succinct: "any limitations in the 2018 Agreement related to warranties have no applicability to Marquette's negligence claim." (ECF No. 43 at 18.)

Marquette's position is not supported by the plain text of the exclusion. Nothing in its language suggests that it is limited to warranty claims. To the contrary, the

language is expansive and unequivocal when it states, "*in no event* will either party have any liability to the other party for any lost profits, revenues or indirect, special, incidental, consequential, or punitive damages, *whether an action is in contract or tort* and *regardless of the theory of liability* …." (ECF No. 44 at 16-17, ¶ 53 (emphasis added) (all caps in original omitted).) Accordingly, Kuali is entitled to summary judgment on Marquette's negligence claim.

**5.  Conclusion**

Marquette's alleged damages are not so speculative as to bar its claims. However, the limitations on damages contained in the 2018 contract limit Marquette's relief. The UCC does not apply because the agreement was predominantly for services. These limitations preclude Marquette from obtaining the relief it seeks under its warranty, contract, and negligence claims. Accordingly, Kuali's motion for summary judgment (ECF No. 36) will be granted and Marquette's motion for partial summary judgment (ECF No. 29) will be denied. Because Kuali is entitled to summary judgment as to the whole of Marquette's complaint, Marquette's motion to exclude the opinion of R. Michael Garland (ECF No. 23) is moot and will be dismissed as such.

**IT IS THEREFORE ORDERED** that Marquette's motion for partial summary judgment (ECF No. 29) is **denied**.

**IT IS FURTHER ORDERED** that Kuali's motion for summary judgment (ECF No. 36) is **granted**. Marquette's amended complaint and this action are dismissed. The Clerk shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that Marquette's motion to exclude the testimony of R. Michael Garland is **dismissed as moot**.

Dated at Milwaukee, Wisconsin this 7th day of February, 2022.

WILLIAM E. DUFFIN
U.S. Magistrate Judge